IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Joseph Darrah, Harry Darrah, | : | |
| and Kitty Darrah, Individually, | : | |
| and Joe Darrah, Inc. d/b/a J&K | : | |
| Salvage and Jason Smith, | : | |
| | : | |
| Petitioners | : | |
| | : | |
| v. | : No. 916 C.D. 2025 | |
| | : Argued: April 13, 2026 | |
| Department of Labor and Industry, | : | |
| Bureau of Labor Law Compliance, | : | |
| | : | |
| Respondent | : | |

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
                    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                    HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                              FILED:      July 21, 2026

Joseph Darrah, Harry Darrah, and Kitty Darrah, individually, and Joe Darrah, Inc. d/b/a J&K Salvage (Company) and Jason Smith (Smith) (collectively, Petitioners) petition for review from an order of the Secretary of the Pennsylvania Department of Labor and Industry (respectively, Secretary and Department), imposing an administrative penalty in the amount of $230,000 jointly and severally on Harry Darrah and Company. For the reasons that follow, we affirm in part and vacate and remand in part for further findings.

**Background**

On March 1, 2024, the Department's Bureau of Labor Law Compliance (Bureau) issued an order to show cause (OSC) against Petitioners. The Bureau alleged that Petitioners violated the Child Labor Act (Act)[1] and its regulations by employing four minors[2] in a hazardous occupation or establishment. It further alleged that while working at Petitioners' salvage yard, the minors performed work prohibited by the Fair Labor Standards Act of 1938 (FLSA),[3] including welding and tasks around a shredder. The Bureau also asserted that Petitioners failed to maintain records associated with the minors' work permits; failed to provide and/or properly document work breaks after the minors worked for five hours, allowed the minors to work outside of permitted hours, and allowed the minors to work excessive hours on numerous occasions.

A hearing was held in August 2024, during which both sides presented witnesses. The hearing examiner issued a proposed report in January of 2025. He credited evidence that Harry Darrah served as president and day-to-day operator of Company, whereas Kitty Darrah had no operational role. Hearing Examiner's Proposed Report, Findings of Fact (F.F.) Nos. 3, 6.[4] He further determined that Smith acted as Company's office manager and handled payroll and timekeeping but

---

[1] Act of October 24, 2012, P.L. 1209, *as amended*, 43 P.S. §§40.1-40.14.

[2] The minors are identified as B.B., C.C., R.L. and P.S. Minors all attended the York County School of Technology.

[3] 29 U.S.C. §201-262.

[4] The proposed report can be found on page 245a of the Reproduced Record.

did not have supervisory authority over the minor employees. *Id.*, F.F. Nos. 9, 11.[5] Finally, to the extent that the OSC included a respondent named Joseph Darrah, the hearing examiner determined that Joseph Darrah and Harry Darrah are the same person. "Joseph is Harry Darrah's middle name, and he regularly goes by 'Joe.'" Hearing Examiner's Proposed Report at 23. Thus, the hearing examiner reasoned that "[t]he charges against Joseph Darrah, while not dismissed, *per se*, are effectively merged with the allegations against Harry Darrah because they reference the same person." *Id.*

The hearing examiner found that beginning on or about June 15, 2023, Company employed the four minors but not through any type of cooperative education (co-op) program with the York County School of Technology. Hearing Examiner's Proposed Report, F.F. Nos. 35-36. One of the minors, B.B., testified that he worked for Company for approximately six months, from late May 2023, until just before Christmas of 2023. *Id.*, F.F. No. 37. The hearing examiner made the following findings relative to B.B.'s testimony:

> 38. During the summer, B.B. typically worked at Company from 7:00 a.m. to 5:00 p.m., Monday through Friday, and then 7:00 a.m. to noon on Saturdays.
>
> 39. During the school year, B.B. worked at [C]ompany starting at around 4:00 p.m. until his job was done – which might be 6:00 p.m., or it might be 10:00 p.m. or 11:00 p.m.
>
> 40. During the summer, B.B. would take a lunch break around noon; during the school year B.B. would take lunch around 6:30 p.m. or 7:00 p.m.
>
> 41. Most of the time B.B. would not take breaks other than his lunch break.

---

[5] The hearing examiner ultimately dismissed Kitty Darrah and Smith from the case. No one has challenged this disposition.

42. B.B. was not instructed to record his breaks and did not keep any independent record of his breaks.

* * *

46. Company had a time clock to punch in and out of work.

* * *

48. Minor students were not required to separately clock-in or clock-out for lunch; instead, Company would automatically take 30 minutes out of the timecards for lunch.

* * *

51. B.B. worked as a mechanic for Company, and worked on all of its equipment, trucks and trailers.

52. B.B. operated a welder approximately once per week while working for Company.

53. Twice while working for Company, B.B. was directed to clean any scrap metal that fell under the shredder.

54. In the summer of 2023, P.S. worked with B.B. in the shop on Company's equipment, trucks, and trailers.

55. B.B. observed P.S. utilizing a welder approximately once a week.

* * *

59. C.C. worked in Company's weld shop[.]

60. B.B. was not in the area of the shredder each day and therefore did not observe C.C. welding on the shredder every day; however, it was B.B.'s understanding that C.C.'s duties included welding anything that broke on the

4

shredder and that he performed these duties just about every day.

61. R.L. began working for Company approximately one (1) week before school started in 2023.

62. R.L. was hired as a mechanic.

63. R.L. helped C.C. at the shredder, and worked there daily.

*Id.*, F.F. Nos. 31-42, 46, 48, 51-55, 59-63 (citations to transcript omitted).

The Bureau also presented the testimony of Waylon Fincher, a Bureau investigator. Fincher testified that he became aware of Company having potential issues with minors working in prohibited occupations during the course of a separate investigation. Fincher and a team made plans to go to Company's location in September of 2023 to conduct an investigation and interview suspected minor employees. On the day of the investigation, Fincher met with his fellow investigators at a convenience store near Company's location prior to entering Company's premises. Before the investigation could begin, there was an explosion at Company. The suspected cause of the incident was a propane cylinder that exploded in the shredder. Emergency medical services were dispatched to the scene. Because of the explosion, Fincher and his team were not permitted to inspect the area of the shredder. Fincher and his team were, however, shown the welding and mechanics shop by Harry Darrah. Hearing Examiner's Proposed Report, F.F. Nos. 68-74.

As part of his investigation, Fincher sent Company a letter requesting certain documentation. Smith responded on behalf of Company. Based on Fincher's testimony and Exhibits introduced by the Commonwealth, the hearing examiner found:

5

77. The documentation submitted by Company in response to Fincher's request did not document the times of day that the minor students received breaks after working five (5) hours on:

   a. B.B.: 42 occasions;
   b. C.C.: 50 occasions;
   c. R.L.: 4 occasions;
   d. P.S.: 44 occasions.

78. Company did not send, nor retain, the statutorily required letter to the issuing officers who issued the work permits for any of the four (4) minor students.

79. Company did not create and/or maintain complete and accurate records of breaks taken by the minor employees.

80. None of [Petitioners] provided Fincher with documentation to indicate that the minor students were participating in a co-op program.

81. While School was in session, C.C. worked:

   a. in excess of eight (8) hours per day on five (5) occasions,
   b. more than 28 hours per week on four (4) occasions,
   c. before 6 a.m. on one (1) occasion, and
   d. after midnight on one (1) occasion.

82. While School was in Session, R.L. worked:

   a. more than eight (8) hours per day on one (1) occasion, and
   b. more than 28 hours per week on one (1) occasion.

83. While School was in session, P.S. worked:

   a. more than eight (8) hours per day on five (5) occasions, and

6

b. more than 28 hours per week on three (3) occasions.

84. While School was in a vacation period, B.B. worked:

    a. more than ten (10) hours per day on three (3) occasions,
    b. more than 48 hours per week on six (6) occasions, and
    c. before 6:00 a.m. on one (1) occasion.

85. While School was in a vacation period, C.C. worked:

    a. more than ten (10) hours per day on 12 occasions,
    b. more than 48 hours per week on three (3) occasions, and
    c. before 6:00 a.m. on five (5) occasions.

86. While School was in a vacation period, R.L. worked more than ten (10) hours per day on one (1) occasion.

87. While School was in a vacation period, P.S. worked:

    a. more than ten (10) hours per day on two (2) occasions,
    b. more than 48 hours per week on one (1) occasion, and
    c. before 6:00 a.m. on one (1) occasion.

Hearing Examiner's Proposed Report, F.F. Nos. 77-87.

The hearing examiner found:

7. Unless permitted by the regulations of the Department related to employment in a work experience or career exploration program, an apprenticeship program or a school-to-work program, [m]inors are prohibited from employment in any occupation or establishment designated as hazardous, which includes the operation of dangerous machinery and other occupations or work otherwise prohibited under the FLSA and regulations

7

under that [A]ct. (43 P.S. §§40.4, 40.12; 34 Pa. Code §§11.31-11.85).

8. Setting up, adjusting, repairing, oiling or cleaning, operating or helping to perform those activities on a power-driven metal forming, punching or shearing machine, as well[] as the operation or helping on fixed or portable circular saws, band saws, guillotine shears, chain saws, reciprocating saws, and abrasive cutting discs are considered hazardous occupations for minors under the FLSA and its regulations. (29 C.F.R. §§570.59, 570.65).

9. Minors are prohibited from being employed to engage in acetylene or electric welding except apprentices, student learners, and graduates of an approved vocational, technical, or industrial education curriculum which prepared them for employment in the specific occupation. (34 Pa. Code §11.33).

* * *

12. In that minor students had not graduated from [York County Technical School], and no co-op agreement was in place with [York County Technical School] for any of the minor students while working at Company, the exceptions under the Act, FLSA, or applicable regulations relating to apprentices, student learners and graduates of an approved vocational, technical or industrial education curriculum which prepared them for employment in the specific occupation do not apply to the minor students. (F.F. [Nos.] 12-29, 32, 34-36; 34 Pa. Code §11.21 at Apprentice and Student learner).

13. In that B.B. cleaned or helped to perform cleaning activities on a power-driven metal forming, punching, or shearing machine, or during the operation or helping on fixed or portable circular saws, band saws, guillotine shears, chain saws, reciprocating saws, and abrasive cutting discs, and B.B. performed welding activities for [C]ompany, B.B. was were [sic] permitted to engage in occupations for Company which are designated as hazardous, in violation of 43 P.S. §40.4(a)(2). (F.F. 59, 60; [Conclusions of Law (CoL) Nos.] 7, 8, 9, 12).

8

14. In that C.C. repaired, cleaned, operated or helped to perform those activities on a power-driven metal forming, punching, or shearing machine, or during the operation or helping on fixed or portable circular saws, band saws, guillotine shears, chain saws, reciprocating saws, and abrasive cutting discs, and C.C. performed welding activities for [C]ompany, C.C. was permitted to engage in occupations for Company, which are designated as hazardous, in violation of 43 P.S. §40.4(a)(2). (F.F. [Nos.] 59, 60; CoL [Nos.] 7, 8, 9, 12).

15. In that R.L. repaired, cleaned, operated or helped to perform those activities on a power-driven metal forming, punching, or shearing machine, or during the operation or helping on fixed or portable circular saws, band saws, guillotine shears, chain saws, reciprocating saws, and abrasive cutting discs, and R.L. was permitted to engage in occupations for Company, which are designated as hazardous, in violation of 43 P.S. §40.4(a)(2). (F.F. [Nos.] 62, 63; CoL [Nos.] 7, 8, 12).

16. In that P.S. engaged in welding activities while working for Company which are designated as hazardous, in violation of 43 P.S. §40.4(a)(2). (F.F. [Nos.] 54, 55; CoL [Nos.] 7, 8, 9).

17. In that Company failed to maintain a copy of the letter sent to the issuing officer of each minor student's work permit announcing the employment of the minor, Company and Harry [Darrah] violated 43 P.S. §40.8(d)(3). (F.F. [Nos.] 25, 78). **Four (4) counts are sustained,** representing one (1) count for each of the four students.

18. In that Company's records do not indicate the time(s) that the minor students took their breaks, Company did not maintain complete and accurate records of the actual days, hours and times of day the minors worked, including breaks. Company and Harry [Darrah] violated 43 P.S. §40.8(d)(4). (F.F. [Nos.] 35, 37-49, 77). **One Hundred Forty (140) counts are sustained**, representing 42 counts with regard to B.B., 50 counts with regard to C.C., four (4) counts with regard to R.L., and 44 counts with regard to

9

P.S. (F.F. [left blank in Hearing Examiner's Proposed Report]).

19. In that Company's records indicate that C.C. worked in excess of five (5) hours without being given a thirty (30) minute break on four (4) occasions, Company and Harry [Darrah] violated 43 P.S. §40.3(a). (F.F. [No.] 50).

20. In that Company employed minor students before 6:00 a.m. on eight (8) occasions, Company and Harry [Darrah] violated 43 P.S. §40.3(f)(1)(iii). (F.F. [Nos.] 81(c), 84(c), 85(c), 87(c)). **Eight (8) counts are sustained**, representing six (6) counts with regard to C.C., one (1) count with regard to B.B., and one (1) count with regard to P.S.

21. In that Company employed a minor student after midnight on one (1) occasion while School was in session, Company and Harry [Darrah] violated 43 P.S. §40.3(f)(1)(iii). (F.F. [No.] 81(d)). **One (1) count is sustained**, representing one (1) count with regard to C.C.

22. In that Company employed minor students in excess of eight (8) hours per day on 13 occasions while School was in session, Company and Harry [Darrah] violated §40.3(f)(1)(iii). (F.F. [Nos.] 81(a), 84(a), 85(a)). **Thirteen (13) counts are sustained**, representing five (5) counts with regard to C.C., one (1) count with regard to R.L. and five (5) counts with regard to P.S.[6]

23. In that Company employed minor students in excess of ten (10) hours per day on 18 occasions while School was in a vacation period, Company and Harry [Darrah] violated 43 P.S. §40.3(f)(2)(i). (F.F. [Nos.] 84(a), 85(a), 86, 87(a). **Eighteen counts are sustained**, representing three (3) counts with regard to B.B., 12 counts with regard to C.C., one (1) count with regard to R.L., and two (2) counts with regard to P.S.

---

[6] This calculation appears to omit that B.B. worked in excess of eight hours on three occasions. Hearing Examiner's Proposed Report, F.F. No. 84.

24. In that Company employed minor students in excess of 28 hours per week on eight (8) occasions, while School was in session, Company and Harry [Darrah] violated 43 P.S. §40.3(f)(1)(i). (F.F. [Nos.] 81(b), 82(b), 85(b)). **Eight (8) counts are sustained**, representing four (4) counts with regard to C.C., one (1) count with regard to R.L., and three (3) counts with regard to P.S.

25. In that Company employed minor students in excess of 48 hours per week on ten (10) occasions while School was in a vacation period, Company and Harry [Darrah] violated 43 P.S. §40.3(f)(2)(i). (F.F. [Nos.] 84(a), 85(a), 86, 87(a)). **Ten (10) counts are sustained**, representing three (3) counts with regard to B.B., three (3) counts [sic[7]] with regard to C.C., and one (1) count with regard to P.S. occasions.

Hearing Examiner's Proposed Report, CoL Nos. 7-22 (emphasis in original).

As to his recommended civil penalty, the hearing examiner wrote:

Pursuant to Section 11 (c and d) of the Act, 43 P.S. §[40.11(c), (d)], the Department may impose an administrative penalty of **not more** than $5,000 for each violation of the [A]ct, and may order a person to take corrective action which the [D]epartment deems necessary to address a violation.

The purpose of administrative sanctions is not to punish; that is the province of the criminal justice system. In fact, the Act separately provides for criminal sanctions when persons violate the Act. (*See*, Section 11(b) of the Act, 43 P.S. §40.11(b)). Instead, in an administrative setting, the prior offending conduct is utilized as a guide to determine the appropriate sanction which might be necessary to protect the public going forward. (*See, e.g., Sweeny v. State [Board] of Funeral Directors*, 666 A.2d 1137 (Pa. Cmwlth. 1995)). A properly fashioned sanction always serves one primary function—to provide sufficient

_____

[7] Finding of Fact No. 84(b) reflects that B.B. worked more than 48 hours per week on six occasions.

deterrence to the violator to keep him, her or it from engaging in unlawful conduct in the future.

However, an administrative sanction might also have a secondary, salutary result. It can help motivate others faced with similar circumstances to refrain from engaging in the same or similar unlawful conduct.

The conduct of Harry [Darrah] and Company does not appear to have been caused knowingly or with malice, and there is no evidence that they were previously found in violation of the Act. Instead, the violations proven against them, while clearly numerous, appear to have been borne out of negligence with regard to their duties as employers of minors. Therefore, while clearly a substantial penalty is warranted, given both the number of violations, as well as the breadth and seriousness of violations proven in this case, the imposition of the maximum civil penalty for every violation is unwarranted.

On the contrary, the imposition of the administrative penalties of over $1 million, as requested by the Bureau (even at the suggestion that the penalty be imposed jointly and severally instead of individually) does not appear to take into account the apparent lack of malice or recidivism. It also would frustrate the purpose of administrative sanctions for violations borne out of negligence, as it would likely have the effect of simply putting Company out of business instead of providing Company with a path to correct its conduct, move forward, and hopefully become an example for others via its corrected conduct. Finally, such an oversized penalty would have the very real possibility of discouraging other employers from taking on student learners, lest unintended errors result in tens or hundreds of thousands of dollars in penalties.

However, Company's request for a sanction of not greater than $50 also clearly fails to take into account the significant non-compliance by Company and Harry [Darrah]. The very purpose of the [A]ct is to ensure that minors operating within [the] industry are protected from conduct which is unsafe and exploitive. As noted, the

12

purpose of administrative sanctions is to ensure future compliance. It should set an amount which will effectively remove motivation for the violator or others to engage in similar conduct in the future.

Sanctions, properly set, may serve as a powerful motivator for an organization wishing to engage minors as employees to invest the necessary resources to ensure compliance. . . . A penalty of $50—likely less than the cost to refill the tank on a work truck once—would essentially invite Company, Harry [Darrah], and every other employer to take their chance at being caught, instead of spending the time and resources to prevent violations in the first place.

Company and Harry [Darrah] employed four (4) minors to work at Company's facility. While they did obtain copies of the minors' work permits, they failed to notify, in writing, the officer who had issued the work permits that Company would be employing the students and the hours the students would work. By itself this might be considered an administrative error and subject to a minor penalty if the matter was not able to be resolved through non-litigation compliance methods. However, in this case, those violations are just one small part of a much larger set of violations. An administrative penalty of $50.00 per missing letter, or a total of $200.00 imposed jointly and severally between Harry [Darrah] and Company for that violation appears appropriate to properly motivate Harry [Darrah] and Company, and others similarly situated, to ensure that those letters are created, transmitted, and maintained of record in the future.

Company's failure to comply with the Act was not limited to just failing to send a letter to the issuer of the work permit. Instead, Company also failed to keep accurate records of the "times of day the minors worked, including breaks," as required by 43 P.S. §40.8(d)(4). Instead, Company claims to have simply deducted a 30-minute break period from the employees['] pay. There were 140 instances where, to the extent a break was given, it was not accurately recorded as required—it had to be implied from the difference between the total of the start and stop time

13

and the amount that Company elected to pay the minor. To the extent that minor students did take all breaks required by the Act, such a violation in terms of documentation would not directly impact the health and safety of the minors. Instead, it is an administrative/enforcement concern in that the records Company maintained would not readily permit audit and investigation. Therefore, a similar $50 penalty per violation, assessed jointly and severally, appears appropriate for those set of violations—a total of $7,000 for 140 violations.

Company's records do indicate that minor C.C. was permitted to work in excess of five (5) hours without a break on four (4) occasions. This is a more serious violation in that overwork both puts the minor at risk of making mistakes and injuring himself or herself. However, the proven times when C.C. worked in excess of five (5) hours was not typical—only 4 days out of 12 weeks. A $200.00 penalty for each violation, assessed jointly and severally, appears appropriate for that set of violations to motivate Company, Harry [Darrah], and others similarly situated to more closely monitor the minors who work form [sic]—a total of $800.

The overworking of minors is not limited to working continuously on a single day. It can also include permitting minors to engage in work too early and too late, as well as working excessive hours in a day and excessive hours in a week. Each violate the Act and can be detrimental to the physical health and mental wellbeing of a minor. Company and Harry [Darrah] permitted their minor student employees to work before 6:00 a.m., or after midnight on nine (9) occasions. A $200 penalty for each violation ($1,800), assessed jointly and severally, appears appropriate to motivate Company and Harry [Darrah] to correct the failure in supervision for those violations.

Just as having minor employees work excessive hours in a row can lead to mistakes and injury, so too working excessive hours in a day can lead to error, which may negatively impact the safety of a minor both on and off the job. During the school term, it can also interfere with the

14

student's ability to concentrate in school and to complete necessary study and assignments outside of school. There can also be financial motivation for an employer to request/require minors to work additional hours. It may eliminate the need to hire and train an additional employee, it can reduce the potential need to raise hourly wages to attract additional employees, and it may permit the employer to take on additional work which it would not otherwise be able to complete. Company and Harry [Darrah] permitted the minors to work excessive hours in a day on 31 occasions—clearly not an isolated occurrence. A $500 penalty for each violation ($15,500 total), assessed jointly and severally, appears appropriate for that set of violations.

Similarly Company and Harry [Darrah] allowed students to work in excess of the weekly maximum on 18 occasions. Again, this does not appear to be an isolated occurrence and permitting minor employees to work over 28 hours in a week during the school term, and over 48 hours a week when school is on vacation, even if minors allegedly volunteered to do it is generally prohibited under the Act. A similar $500.00 penalty for each violation ($9,000), assessed jointly and severally, appears appropriate for that set of violations.

Finally, Company and Harry [Darrah] were shown to have employed the minor students in a hazardous industry, without the required approvals, approved safety training, and oversight by the school they attended. This is one of the most serious violations under a law meant to protect minors. The need to protect minors in hazardous industries was coincidentally, but amply, borne out on the day of the Bureau's inspection by the explosion in the shredder machine—a machine several of the minors regularly repaired. Setting up, repairing, operating, cleaning or even helping on those machines is generally prohibited for a minor. The minor students also regularly engaged in welding activities, which are also specifically listed as a generally prohibited occupation for minors in the Department's regulations. Because of the potential for significant harm by allowing improperly monitored students to engage in those activities, imposing the full

15

$5,000 per violation penalty, jointly and severally, for each of the four (4) minor students – a total of $20,000 penalty, appears appropriate to impress upon Harry [Darrah] and Company the seriousness of the violation and to deter future use of improperly monitored minor students in a hazardous industry. To the extent minors are employed by Company and Harry [Darrah] in hazardous occupations in the future, it can and must only occur through the approved co-op program where the appropriate oversight occurs.

Hearing Examiner's Proposed Report at 31-37 (emphasis in original).

Thus, the hearing examiner's proposed report and order suggested that a civil penalty of $54,300 be jointly and severally imposed upon Harry Darrah and Company and that Harry Darrah and Company be ordered to cease and desist in the employment of minors in violation of the Act. Petitioners filed exceptions and on June 26, 2025, the Secretary issued an order accepting proposed findings of fact and conclusions of law of the hearing examiner; however, without explanation, the Secretary imposed an increased civil penalty against Harry Darrah and Company in the amount of $230,000. Petitioners then filed the instant timely petition for review from the Secretary's order.[8]

## Discussion

At its core, the Act reflects the Legislature's intent to protect the health, safety and welfare of working minors. With this guiding purpose in mind, we address the issues that Petitioners raise on appeal.

---

[8] Our review of an agency decision is limited to whether an error of law was committed, constitutional rights were violated, that the agency's practice or procedure was not followed, or that findings of fact are not supported by substantial evidence. *East Coast Vapor LLC v. Department of Revenue*, 330 A.3d 521, 538 n.6 (Pa. Cmwlth. 2025).

16

Petitioners' first argument concerns whether the Bureau presented sufficient evidence for the hearing examiner to find that Harry Darrah and Company violated the Act by failing to provide the four minors with regular breaks and by permitting them to work excessive hours. Pertinent here, Section 3 of the Act provides:

> **(a) Rest break.**--No minor may be employed for more than five hours continuously without an interval of at least 30 minutes for a rest break. No period of less than 30 minutes shall be deemed to interrupt a continuous period of work.
>
> **(b) Time restriction.**--Except for newspaper delivery under section 14, a minor may not be employed for more than six consecutive days.
>
> . . . .
>
> **(f) Hours of employment for minors 16 years of age or older.**--The hours of employment for minors who are 16 years of age or older are as follows:
>
> > (1) When school is in session, an individual who is 16 years of age or older shall be limited as follows:
> >
> > > (i)  The minor may not be employed for more than 28 hours per week during a regular school week.
> > >
> > > (ii)  The minor may not be employed for more than eight hours in a single day.
> > >
> > > (iii)  The minor may not be employed before 6 a.m. or after 12 midnight, except that during a school vacation period a minor shall be permitted to be employed until 1 a.m.
> >
> > (2) During a school vacation, an individual who is 16 years of age or older shall be limited as follows:

(i)     The minor may not be employed for more than ten hours in a single day.

(ii)     The minor may not be employed for more than 48 hours in a single week provided that any hours worked more than 44 in a single week shall be voluntarily agreed to by the minor and further provided that the minor may reject any request for employment in excess of 44 hours in a single week without retaliation.

43 P.S. §40.3.  Beyond substantive restrictions on hours and breaks, Section 8(d)(4) of the Act imposes a separate obligation on employers to "maintain accurate records of the actual days, hours and times of day the minors worked, including breaks."  43 P.S. §40.8(d)(4).

Petitioners maintain that the "clear uncontroverted evidence" presented before the hearing examiner was insufficient to prove that they violated the Act.  *See* Petitioners' Brief.  Petitioners assert that the testimony of Harry Darrah and Smith demonstrate that the minors did, in fact, take regular 30-minute breaks and did so "every four hours rather than the less frequent interval of every five hours prescribed by state law."  *Id.* at 15 (citing Transcript of Proceedings, Reproduced Record (R.R.) at 106a, 111a, 167a-68a).  Petitioners highlight Smith's testimony that break periods were deducted and reflected in the payroll records, which they believe satisfies the Act's recordkeeping requirements.  In their view, the statute requires only that breaks be reflected somewhere in the employer's records, "not that they be reflected in a specific type of record such as timecards scrutinized by the Bureau."  Petitioners' Brief at 15-16.  Petitioners contend that even if the Bureau proved recordkeeping deficiencies, such deficiencies amount to only "mistakes of inadvertence" and not "intentional, knowing, or reckless conduct[.]"  *Id.* at 16.  Finally, Petitioners reason that if, as the Bureau argues, the timecards did not fully reflect the minors' breaks,

they cannot provide sufficient proof to support the Bureau's argument that minors worked excessive hours.

The Bureau responds that substantial evidence supports the Secretary's finding that Petitioners committed 140 break violations because the minors' timecards did not record the actual times of day when the breaks were taken as required by Section 8(d)(4) of the Act. The Bureau emphasizes that the Act mandates that minors receive a 30-minute break within the first five hours of work and that employers accurately document when the breaks occur; here, Petitioners' records did neither. The minors' timecards routinely showed long shifts with only one automatic 30-minute deduction or, in some cases, timecards explicitly stated that no lunch was taken, confirming violations of the Act. *See* Commonwealth's Exhibit 8 at 9. The Bureau further argues that Petitioners' reliance on payroll deductions showing 30-minute breaks, as well as selective testimony suggesting breaks occurred, cannot overcome the documentary evidence. Indeed, payroll stubs do not reflect when breaks occurred, whether they were timely, or whether they were taken at all, and witness testimony did not establish the timing or frequency of the minors' breaks. Based on the totality of the evidence presented, the Bureau asserts that the Secretary did not err.

Based on our review, we believe that Petitioners' argument misses the point. The dispositive issue in this case is not whether the breaks occurred in practice, but whether Petitioners complied with the Act's recordkeeping mandate, which requires employers to maintain "accurate records of actual days, hours and times of day the minors worked, including breaks." 43 P.S. §40.8(d)(4). The Act places the burden squarely on an employer to document **when** breaks occur so that compliance can be verified. Here, the timecards did not record the start and end

times of *any* breaks. We do not believe payroll deductions or the generalized testimony of Harry Darrah and Smith satisfy the Act's requirement of contemporaneous, accurate documentation of break times and clearly do not allow the Bureau to assess whether breaks were timely given or taken. In sum, Petitioners' focus on whether breaks were given cannot overcome their failure to comply with the Act's mandatory recordkeeping provisions; thus, we conclude this argument is without merit.[9]

Petitioners next argue that the sanctions imposed by the Secretary are unconstitutionally excessive under the Eighth Amendment of the United States Constitution and article I, section 13 of the Pennsylvania Constitution. We are unable to meaningfully address this claim, however, without an explanation from the Secretary as to why she adopted the hearing examiner's detailed findings, conclusions of law and analysis, but departed from his recommended civil penalty of $54,300 and instead imposed a penalty of $230,000—an increase of more than fourfold—without articulating her rationale for doing so.

In *Delker v. Pennsylvania State Horse Racing Commission*, 581 A.2d 258 (Pa. Cmwlth. 1990), this Court faced a similar conundrum. There, the petitioner, a licensed horse trainer, had two horses entered in a race. The petitioner attended to one of the horses and left the second horse in the care of another individual. The second horse finished first in its race and, following the race, a urine sample was taken from the horse. The urine sample tested positive for a prohibited drug and the presiding judge for the racetrack suspended the petitioner indefinitely pending a

---

[9] To the extent Petitioners argue that because the timecards do not accurately reflect the minors' break times, they likewise cannot support the Secretary's finding of excessive hours violations, the argument is unpersuasive. The statutory requirement to record break times does not undermine the undisputed time-in and time-out entries which establish the total hours minors were on the clock.

20

hearing before the State Harness Racing Commission (Commission). Following a hearing, the Commission's hearing examiner issued a proposed adjudication that contained "extensive findings of fact, and a thorough discussion of the applicability of various Commission rules to the matter at hand." *Id.* at 487. The hearing examiner made a specific finding that the petitioner did not drug the second horse, but concluded that she still had to be held accountable for her negligence in not ensuring that the second horse was properly cared for prior to the race. Ultimately, the hearing examiner recommended that the Commission impose a 30-day suspension for the petitioner's negligent conduct. *Id.*

Discussing the Commission's final adjudication, the *Delker* court observed:

> Although the Commission heard no additional testimony and made no findings of its own, apparently relying on the findings and conclusions reached by [the hearing officer], it disregarded her recommendation as to the penalty, and instead imposed a two-year suspension against [the petitioner].

*Delker*, 581 A.2d at 259. In her appeal, the petitioner challenged the imposition of the two-year suspension of her trainer's license, arguing that the Commission abused its discretion. This Court agreed, stating:

> We have recognized that the length of suspension imposed in a situation such as this is a matter of discretion. However, we are at a loss to explain why, in this instance, the Commission chose to impose a penalty so much greater than that recommended by its hearing officer.
>
> * * *
>
> The Commission makes no separate findings or conclusions, nor does it offer any explanation for its

21

decision to make such a significant departure from the recommended penalty in this matter. This circumstance hinders us in performing our role of reviewing the Commission's determination to ascertain whether the penalty exacted against [the petitioner] constitutes an abuse of the discretion vested in it.

We do not, as [the petitioner] would have us, find that the Commission erred in imposing a suspension here. However, we believe that the Commission's imposition of a penalty so far removed from the hearing officer's recommendation, particularly in light of the specific finding that [the petitioner] did not drug her horse, warrants some greater explanation than the Commission has provided to enable us to determine if this penalty constitutes an abuse of its discretion.

Therefore, we remand this matter to the Commission for reconsideration . . . .

*Id.* at 260 (citations omitted).

Much like the situation in *Delker*, we are presented herein with a record in which the hearing examiner issued exhaustive findings of fact, detailed conclusions of law, and a reasoned explanation for the recommended civil penalty. The hearing examiner carefully articulated the statutory framework, evaluated the evidence supporting each violation, and justified the calculation of a $54,300 penalty. Yet, as in *Delker*, the Secretary adopted the hearing examiner's factual and legal determinations but then departed dramatically from the recommended sanction, imposing a penalty more than four times greater without offering any explanation for the increase. This unexplained deviation leaves the Court unable to perform meaningful appellate review or to determine whether the penalty imposed is unconstitutionally excessive, as Petitioners contend. As *Delker* makes clear, when an agency significantly enhances a sanction while relying on a hearing examiner's underlying findings, it should articulate its reasoning. Without such an explanation,

22

we are compelled to vacate and remand for clarification before we may address the constitutional issues raised.

## Conclusion

For the reasons set forth above, we conclude that the Secretary did not err in finding that Petitioners violated the Act, and we affirm the Secretary's order in that respect. However, because the Secretary substantially increased the civil penalties without providing any explanation for departing from the hearing examiner's recommended sanction, we are unable to conduct meaningful appellate review. Accordingly, we vacate that portion of the Secretary's order awarding a $230,000 administrative penalty, and remand this matter and direct the Secretary to issue a supplementary opinion explaining her rationale for the increased sanction.


MICHAEL H. WOJCIK, Judge

23

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph Darrah, Harry Darrah, : 
and Kitty Darrah, Individually, : 
and Joe Darrah, Inc. d/b/a J&K : 
Salvage and Jason Smith, : 
 : 
                  Petitioners : 
 : 
          v. : No. 916 C.D. 2025
 : 
Department of Labor and Industry, : 
Bureau of Labor Law Compliance, : 
 : 
             Respondent : 

# **O R D E R**

AND NOW, this 21st day of July, 2026, the June 26, 2025 order of the Secretary of the Pennsylvania Department of Labor and Industry (Secretary) is **AFFIRMED** to the extent that she found Petitioners Joseph Darrah, Harry Darrah and Joe Darrah, Inc. d/b/a J&K Salvage violated the Child Labor Act, Act of October 24, 2012, P.L. 1209, *as amended*, 43 P.S. §§40.1-40.14.

To the extent that the Secretary's order awarded an administrative penalty in the amount of $230,000, the order is **VACATED**, and the matter is **REMANDED** to the Secretary to issue a supplementary opinion explaining her rationale for the increased sanction. The supplementary opinion shall be filed with this Court within 60 days of the exit date of this order.

The Prothonotary is directed to immediately remit the certified record to the Department of Labor and Industry.

Upon receipt of the supplementary opinion, this matter shall be decided by this Court on the papers previously filed, unless additional briefs are ordered by the Court.

Jurisdiction is **RETAINED**.

_____

MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph Darrah, Harry Darrah,      :
and Kitty Darrah, Individually,     :
and Joe Darrah, Inc. d/b/a J&K   :
Salvage and Jason Smith,       :
                      Petitioners  :
                               :
         v.             : No. 916 C.D. 2025
                               : Argued:  April 13, 2026
Department of Labor and Industry,  :
Bureau of Labor Law Compliance,  :
                   Respondent  :

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

CONCURRING OPINION
BY JUDGE WALLACE                        FILED:  July 21, 2026

      I join the Majority Opinion in its entirety.  The learned Majority not only properly concludes Joseph Darrah, Harry Darrah, and Joe Darrah, Inc. d/b/a J&K Salvage (Petitioners) violated the Child Labor Act (Act),[1] but also correctly vacates the June 26, 2025 order of the Secretary of Labor and Industry (Secretary) insofar as it imposed an administrative penalty of $230,000 upon Petitioners without providing any rationale for the amount assessed, and remands the matter to the Secretary for an explanation of the reasons supporting the penalty.

---

[1] Act of October 24, 2012, P.L. 1209, *as amended*, 43 P.S. §§ 40.1-40.14.

However, I write separately to emphasize that because the Majority has vacated the administrative penalty, the Secretary is not obligated to re-impose the same penalty on remand. Rather, the Secretary retains discretion to impose a lower penalty, if appropriate, in light of the record and the purposes underlying the Act.

Section 11 of the Act contemplates such discretion, providing in relevant part that "the department *may* impose an administrative penalty of *not more than* $5,000 for each violation[.]" 43 P.S. § 40.11(c) (emphasis added); *see Moore v. Dep't of Transp., Bureau of Motor Vehicles*, 19 A.3d 1200, 1208 (Pa. Cmwlth. 2011) ("In general, the penalties imposed by an administrative tribunal are within its judgment absent abuse of discretion.").

The Act, however, is silent as to what factors, if any, the Secretary must consider in assessing an administrative penalty. Accordingly, the Secretary is well within her authority to consider a range of factors.

In this regard, the Secretary may consider all relevant aggravating and *mitigating* circumstances, including (1) whether Petitioners' violations arose from negligence or intentional disregard of the Act's requirements; (2) whether the violations resulted in bodily injury to any minors or created a substantial risk of such injury; (3) whether the violations involved falsification of records or other efforts to conceal noncompliance; (4) whether Petitioners previously have violated the Act; and (5) whether Petitioners have acknowledged the seriousness of their violations and undertaken any corrective measures to prevent future violations. The Secretary may wish to revisit the hearing officer's detailed findings of fact, conclusions of law, and analysis, which she previously adopted.

_____
STACY WALLACE, Judge
